**TECHNIARTS ENGINEERING, Appellee,**

v.

**UNITED STATES of America, Appellant.**

No. 93–5304.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1994.

Decided April 14, 1995.

302

Thomas M. Bondy, Atty., Dept. of Justice, Washington, DC, argued the cause for the appellant. On brief were Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., and Anthony J. Steinmeyer, Atty., U.S. Dept. of Justice, Washington, DC. R. Craig Lawrence, John D. Bates and Susan A. Nellor, Washington, DC, entered appearances for appellant.

Daniel M. Press, McLean, VA, argued the cause for appellee.

Before WILLIAMS, HENDERSON and ROGERS, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The United States Information Agency (USIA) appeals from a summary judgment in favor of Techniarts Engineering (Techniarts), the former producer of the USIA's "TV Marti" newscasts. The district court held that when the USIA's "TV Marti" newscasts. The district court held that when the USIA began producing TV Marti newscasts in-house, instead of renewing its contract with Techniarts, the agency violated the Economy Act, 31 U.S.C. § 1535(a), and the Office of Management and Budget's Circular A–76, 48 Fed.Reg. 37,110 (1983), (OMB Circular), which direct federal agencies to compare the costs of commercial and agency production and to use the former unless more expensive. The district court further held that the USIA violated Federal Acquisitions Regulations, 48 C.F.R. § 37.104(b), (FAR 37.104) by entering into unauthorized private service contracts in the course of internalizing newscast production. Because the USIA was authorized by statute both to move production in-house and to enter into the service contracts, we conclude the agency was not bound by the cited provisions and reverse the district court's decision.

In 1988 Congress authorized the USIA to begin television broadcasts to Cuba, on a trial basis, and appropriated up to $7,500,000 for the tests. See Act of Oct. 1, 1988, Pub.L. No. 100–459, tit. V, 102 Stat. 2186, 2221–22 (1988). In January 1990, after competitive bidding, the USIA contracted with Techniarts to produce a half-hour daily news program for the trial broadcasts. In February 1990, before testing was complete, Congress enacted the TV Marti Act, formally instructing the Director of the USIA to "establish within the Voice of America a Television Marti Service" to "be responsible for all tele-

vision broadcasts to Cuba authorized by this subchapter." 22 U.S.C. § 1465cc(a). Although the Act appropriated $16,000,000 for TV Marti broadcasting in each of fiscal years 1990 and 1991, those funds could not "be obligated or expended unless the President determine[d] and notifie[d] the appropriate committees of Congress that the test of television broadcasting to Cuba ... has demonstrated television broadcasting to Cuba is feasible and will not cause objectionable interference with the broadcasts of incumbent domestic licensees." *Id.* § 1465ee. On August 26, 1990, President Bush notified Congress that he had made the required determination. Presidential Determination No. 90–35, 55 Fed.Reg. 38,659 (1990).

On October 3, 1990, the USIA published notice of its intent to negotiate a "follow-on" contract with Techniarts for the period January 1, 1991 to June 30, 1991. After some negotiation, however, the USIA extended the contract only until March 15, 1991, when the agency took production in-house and began using its own facilities and personnel, as well as some private contractors, to produce the newscasts.

On March 14, 1991, Techniarts filed this action in the district court challenging the USIA's assumption of TV Marti production on the grounds that the agency had not first conducted cost comparisons, as required by the Economy Act and by the OMB Circular, and that it had entered into unauthorized private service contracts for production work, some with former Techniarts employees later hired by the USIA, in violation of FAR 37.104. On August 6, 1993, the district court ruled in favor of Techniarts, on cross-motions for summary judgment, holding that the USIA had violated all three provisions. It remanded the case to the USIA for cost comparisons in conformance with the Economy Act and the OMB Circular and ordered the agency to cease in-house production and to terminate personal service contracts then in effect. The USIA now appeals the court's judgment. Assuming, without so deciding, that claims grounded in the OMB Circular are reviewable,[1] as the district court held, we conclude that the USIA's actions were authorized by the TV Marti Act and therefore not in violation of law.

We first consider the contention that the USIA's decision to move production in-house without first comparing the costs of private and agency production violated the Economy Act[2] and the OMB Circular.[3] The USIA

---

1. There is reason to doubt this assumption. In *United States Dep't of Health & Human Servs. v. FLRA*, 844 F.2d 1087, 1094–96 (4th Cir.1988), the Fourth Circuit, sitting en banc, concluded that the OMB Circular "is not an 'applicable law,'" as that term is used in 5 U.S.C. § 7106(a)(2), and "confers no grievable, arbitrable, or justiciable rights on third parties under Title VII of the Civil Service Reform Act of 1978." *But see Diebold v. United States*, 947 F.2d 787, 801 (6th Cir.1991) ("We are not called on to say whether the Circular, standing alone, would be sufficient as a source of law, but it is clear that in the context of the whole regime of statutes and regulations governing this dispute, the Circular functions as part of the law to apply."). In *United States Dep't of Treasury v. FLRA*, 996 F.2d 1246, 1249–50 (D.C.Cir.1993), this court acknowledged the Fourth Circuit's view that the OMB Circular is "merely an internal executive branch management directive" but found it unnecessary to reach the issue.

2. The Economy Act provides in part:

(a) The head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services if—

   .    .    .    .    .

(4) *the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.*

31 U.S.C. § 1535(a) (emphasis added). In addition, the Economy Act's implementing regulations expressly incorporate the OMB Circular's requirements. *See* 48 C.F.R. § 17.503; *id.* subpt. 7.3.

3. The OMB Circular provides in part:
5. Policy. It is the policy of the United States Government to:
a. Achieve Economy and Enhance Productivity. Competition enhances quality, economy, and productivity. Whenever commercial sector performance of a Government operated commercial activity is permissible, in accordance with this Circular and its Supplement, comparison of the cost of contracting and the cost of in-house performance shall be performed to determine who will do the work.
b. Retain Governmental Functions In-House. Certain functions are inherently Governmental in nature, being so intimately related to the public interest as to mandate perfor-

maintains that the specific provisions of the TV Marti Act preempted any duty the agency might otherwise have had under the Economy Act or the OMB Circular to conduct cost comparisons or to continue to rely on commercial production. We agree.

■ The TV Marti Act provides: "To assure consistency of presentation and efficiency of operations in conducting the activities authorized under this subchapter, the Television Marti Service shall make maximum feasible utilization of Agency facilities and management support, including Voice of America: Cuba Service, Voice of America, and the United States Information Agency Television Service." 22 U.S.C. § 1465cc(b). In *American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 508, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981), the United States Supreme Court observed that the plain meaning of "feasible" is "capable of being done, executed, or effected" and therefore concluded that feasibility does not depend on a comparison of costs and benefits. Consistent with that determination, this court has found occupational safety standards to be feasible "if the cost of compliance does not threaten the 'competitive structure or posture' of the industry," without considering the relative costs of alternative standards. *National Cottonseed Prods. Ass'n v. Brock,* 825 F.2d 482, 487 (D.C.Cir.1987) (quoting *Industrial Union Dep't v. Hodgson,* 499 F.2d 467, 478 (D.C.Cir.1974)); *see also American Iron & Steel Inst. v. OSHA,* 939 F.2d 975, 980 (D.C.Cir.1991) ("A standard is economically feasible if the costs it imposes do not 'threaten massive dislocation to, or imperil the existence of, the industry.'") (quoting *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1265 (D.C.Cir.1980)).[4] Similarly here, the USIA's in-house newscast production must be deemed feasible so long as it does not seriously jeopardize the TV Marti program (or perhaps inflict grave injury on some other program), whether or not commercial production might be cheaper. Thus, to the extent that the Economy Act and the OMB Circular require use of commercial resources when cheaper, they are at odds with the TV Marti Act's mandate to "make maximum feasible utilization" of USIA resources and, as laws of general application, must give way to that specific mandate.[5] *See Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) ("As always, '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'") (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976)). Because there is no evidence of contrary congressional intent here,[6] we conclude that neither the Economy Act nor the OMB Circular required the USIA to compare the costs of agency and commercial production before selecting the former.

■ We also reject the argument that the USIA violated FAR 37.104(b), which provides: "Agencies shall not award personal

mance only by Federal employees. These functions are not in competition with the commercial sector. Therefore, these functions shall be performed by Government employees.
   c. Rely on the Commercial Sector. The Federal Government shall rely on commercially available sources to provide commercial products and services. *In accordance with the provisions of this Circular, the Government shall not start or carry on any activity to provide a commercial product or service if the product or service can be procured more economically from a commercial source.*
48 Fed.Reg. 37,110, 37,114 (1983) (emphasis added).

4. Occupational safety standards must be both technologically and economically feasible. *National Cottonseed Prods.,* 825 F.2d at 487. Because Techniarts objects only to the costs of in-house production, we address only its economic feasibility.

5. That the statute requires "maximum" feasible use of agency resources accentuates the USIA's duty to produce in-house if *at all* feasible.

6. In fact, the drafters of the two general provisions have affirmatively expressed the intent that specific statutes control. *See* Act of Feb. 14, 1984, Pub.L. No. 98–216, § 5(a), 98 Stat. 3, 7 (1984) ("Laws enacted after March 31, 1983, that are inconsistent with [the Economy Act] supersede [the Economy Act] to the extent of the inconsistency."); 48 Fed.Reg. at 37,114 ("The [OMB] Circular and its Supplement shall not ... [b]e applicable when contrary to law, Executive Orders, or any treaty or international agreement....").

services contracts unless specifically authorized by statute (e.g., 5 U.S.C. 3109) to do so." The USIA was, and is, expressly authorized by statute to enter into temporary personal service contracts lasting no longer than one year. Section 3109, the very statute cited in the regulation, permits an agency "[w]hen authorized by an appropriation or other statute" to "procure by contract the temporary (not in excess of 1 year) or intermittent services of experts or consultants or an organization thereof, including stenographic reporting services." 5 U.S.C. § 3109(b). Congress has expressly authorized the USIA "[i]n carrying out" the provisions governing TV MARTI to "procure services of experts and consultants in accordance with section 3109." 22 U.S.C. § 1474(17). Techniarts does not contend that the challenged contracts were not temporary but only that "they were used to circumvent the normal civil service processes—exactly the reason for the prohibition on such contracts." Appellee's Brief at 36–37.

We find this argument unpersuasive. All the USIA did was to enter interim contracts, pursuant to its statutory authority, for services necessary in "carrying out" one of the TV Marti Act's provisions, namely the mandate in 22 U.S.C. § 1465cc(b) to "make maximum feasible utilization of Agency facilities and management support." The agency was under no duty, statutory or otherwise, to make Techniarts the beneficiary of those contracts.

For the preceding reasons, we reverse the judgment of the district court and direct that judgment be entered in favor of the USIA.

*So ordered.*