981 F.2d 1269
 299 U.S.App.D.C. 67
 UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED
STATES AND CANADA, AFL-CIO, LOCAL UNION
NO. 412, et al.
v.
William P. BARR, et al., Appellants.
 No. 91-5337.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 27, 1992.
Decided Dec. 22, 1992.
 
 Sally M. Rider, Asst. U.S. Atty., Washington, DC, argued the cause for the appellants. With her on the briefs were Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys, Washington, DC.
 Marsha S. Berzon, San Francisco, CA, argued the cause for the appellees. With her on the brief were Victor Van Bourg, San Francisco, CA, Kathy L. Krieger, Brian A. Powers, Washington, DC, and Stephen P. Berzon, San Francisco, CA.
 Hamilton Loeb, Thomas A. Lorenzen, and David A. Glauber, Washington, DC, were on the brief for amicus curiae Heerema [299 U.S.App.D.C. 68] Engineering (U.S.), Inc., d/b/a Heerema Offshore Services (U.S.), Inc.
 Before: MIKVA, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 Stated in its broadest terms, the issue presented is whether aliens, in order to perform work installing oil rigs on the outer Continental Shelf, must obtain visas of the type issued to nonimmigrant aliens entering the United States to perform temporary service or labor. Two federal statutes are involved: the Outer Continental Shelf Lands Act of 1953 ("OCSL Act"), 67 Stat. 462, as amended, 43 U.S.C. § 1331 et seq.; and the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. As suggested by the "Lands" in its title, the OCSL Act applies to "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon." 43 U.S.C. § 1333(a)(2)(A). One of its provisions, the meaning of which the parties dispute, extends federal law to these structures. 43 U.S.C. § 1333(a)(1). We are urged to decide whether § 1333(a)(1) requires alien construction workers to comply with United States immigration laws. For the reasons given below, we believe an important threshold issue, not addressed by the district court, must be decided first. We therefore vacate the judgment and remand.
 
 
 2
 * A.
 
 
 3
 In 1945, President Truman issued an executive order announcing that the United States "regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas contiguous to the coasts of the United States and appertaining to the United States, subject to its jurisdiction and control." Proclamation 2667, 10 Fed.Reg. 12,303, reprinted in 59 Stat. 884. The Geneva Convention of the Outer Continental Shelf later recognized the claim. 3 U.N. Doc. A/Conf. 13/L.55, T.I.A.S. No. 5578. In the meantime, jurisdictional controversies arose between the federal government and several coastal States, culminating in Supreme Court opinions holding that the federal government had "paramount" rights over the area three miles seaward, and beyond, of each State's coastline. United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); United States v. Louisiana, 339 U.S. 699, 704, 70 S.Ct. 914, 916, 94 L.Ed. 1216 (1950); United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). While the States therefore could not grant oil and gas leases with respect to the submerged lands off their coasts, there was doubt whether the federal government could do so under the Mineral Leasing Act of 1920, ch. 85, 41 Stat. 437.
 
 
 4
 Congress intervened in 1953 with two major pieces of legislation. The Submerged Lands Act, 43 U.S.C. §§ 1301-1315, relinquished all federal interest in the submerged lands within three geographic miles of the coast. Maryland v. Louisiana, 451 U.S. 725, 730, 101 S.Ct. 2114, 2120, 68 L.Ed.2d 576 (1981). Later in the year, Congress enacted the Outer Continental Shelf Lands Act, reiterating that the "subsoil and seabed of the outer Continental Shelf"--which consists, with certain exceptions (H.R.REP. NO. 590, 95th Cong., 1st Sess. 54 (1977)), of the submerged lands on the Shelf lying seaward of the three mile belt, 43 U.S.C. §§ 1331(a), 1301(a)(2)--"appertain to the United States and are subject to its jurisdiction, control, and power of disposition...." 43 U.S.C. § 1332(1).
 
 
 5
 In choosing a body of law to govern leasing and other activities on the outer Continental Shelf, Congress ultimately settled on a combined federal-state regime. See W. Christopher, The Outer Continental Shelf Lands Act: Key to a New Frontier, 6 STAN.L.REV. 23, 37-43 (1953). Section 1333(a)(2) applies the civil and criminal laws of adjacent States, except their tax laws, "[t]o the extent that they are applicable and not inconsistent with ... other Federal laws and regulations." Section [299 U.S.App.D.C. 69] 1333(a)(1), the provision the parties focus on here, states:
 
 
 6
 The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state: Provided, however, That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.
 
 B.
 
 7
 The events apparently precipitating this lawsuit occurred in 1989, when Heerema Marine Contractors, S.A., a Dutch-owned Swiss company employing nonimmigrant aliens, started construction work for Exxon Company, U.S.A., on the outer Continental Shelf off the coast of Santa Barbara, California. The district court, in its opinion, offers little in the way of detail about Heerema's activities. (Heerema is not a party; the company's United States affiliate appeared as an amicus curiae.) We gather from the record that Heerema's contract was limited to installing platform "jackets," that is, pre-manufactured steel legs and infrastructure, to serve as the foundations for two Exxon oil platforms--the Heritage and the Harmony. Heerema transported the jackets to the outer Continental Shelf and then secured them to the seabed, working from the BALDER, a semisubmersible crane vessel owned by a Heerema affiliate. The BALDER's crew consisted of aliens. Exxon owned the jackets, but according to Heerema's counsel, Heerema had custody and control of the jackets during the installation period.
 
 
 8
 Two labor unions representing American construction workers, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, and the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, sued the Attorney General, the Secretary of State, the Secretary of Transportation, the United States Coast Guard, and the Immigration and Naturalization Service. Citing § 1333(a)(1) of the OCSL Act, the unions claimed that the immigration laws barred alien employees from performing construction work on the outer Continental Shelf without first obtaining the appropriate visas. In their complaint, the unions mentioned the two Exxon "platforms" as examples. Complaint p 26.
 
 
 9
 Under the current version of the Immigration and Nationality Act, a nonimmigrant alien may temporarily enter the United States[1] to perform construction work if he possesses an H-2B visa. Before a consular officer may issue an H-2B visa, the employer petitioning for the alien's admission must obtain "certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers." 8 C.F.R. § 214.2(h)(6)(iv)(1); [299 U.S.App.D.C. 70] see also 8 U.S.C. § 1101(a)(15)(H)(ii)(b).[2] The basic 1952 Immigration and Nationality Act contained similar provisions, §§ 101(a)(15), 212(a)(14), 66 Stat. 163, 167, 183, which trace their lineage to the anti-"coolie" act of 1875 and the Chinese Exclusion Acts, beginning in 1882. C. GORDON & S. MAILMAN, IMMIGRATION LAW AND PROCEDURE § 20.03, at 20-11 to 20-12 (1992).
 
 
 10
 With the district court's approval, the parties agreed to stay all discovery. On cross-motions for summary judgment, the court ruled in favor of the unions, rejecting the government's position that aliens performing temporary construction work on the outer Continental Shelf were not required to obtain H-2B visas. The Immigration and Nationality Act applied to these workers, the court held, as a result of § 1333(a)(1) of the OCSL Act. United Ass'n of Journeymen v. Thornburgh, 768 F.Supp. 375 (D.D.C.1991).
 
 II
 
 11
 If we confined our attention to the activities of Heerema, as best we can discern them from the sparse record before us, one problem immediately presents itself. Installation of jackets takes but a short time. When Heerema's United States affiliate sought leave to file an amicus brief in the district court, it reported that the jackets already were in place. Heerema's crane ship BALDER, we may assume, is therefore no longer operating off the coast of Santa Barbara. The Ninth Circuit confronted a similar situation in Piledrivers' Local Union No. 2375 v. Smith, 695 F.2d 390 (1982), a mandamus action against the Attorney General and the Immigration Service to compel enforcement of the Immigration and Nationality Act on the outer Continental Shelf. There, "Heerema installed an offshore platform for Texaco using the foreign crew on the Challenger I," a foreign-owned heavy lift crane ship. Id. at 392. The installation, which took less than a month, had been completed. Id. Although Heerema was no longer working on the outer Continental Shelf, the court of appeals found the case "ripe for adjudication" because the company shortly would be working there again: it had entered into a contract with Chevron to install another platform using the crew of the Challenger I. Id. The case before us differs from Piledrivers' in the respect that Heerema has not entered into another contract to install jackets, or at least the record does not show as much. While this cuts against finding a live controversy, another difference points in the opposite direction. Unlike Piledrivers', the unions' complaint here is general; Heerema's work for Exxon is cited by way of illustration. The basic challenge is to an ongoing practice of the federal government, permitting aliens not holding H-2B visas to perform the kind of work Heerema did for Exxon, work that members of the unions allegedly could undertake. The government has admitted that it treats aliens performing construction work on offshore oil platforms on the outer Continental Shelf as exempt from the immigration employment restrictions of the Immigration and Nationality Act. Even if the unions' action focussed solely on Heerema's work for Exxon, the case would appear to fall within the exception to the mootness doctrine for issues "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see Christian Knights of the Ku Klux Klan v. District of Columbia, 972 F.2d 365, 369-71 (D.C.Cir.1992). Since installation work on oil platforms is completed so quickly, there would not be sufficient [299 U.S.App.D.C. 71] time for appellate review in the case of any one project.
 
 
 12
 We therefore turn to the merits. The unions frame the question as "whether the Immigration and Nationality Act applies to oil rig construction on the" outer Continental Shelf (Brief at 10) and assume the case depends entirely on the effect of § 1333(a)(1) of the OCSL Act. We think this formulation misses a preliminary point of significance.
 
 
 13
 Section 1356 of the OCSL Act, added in 1978, Pub.L. No. 95-372, tit. II, § 208, 92 Stat. 669, requires the Coast Guard to issue rules requiring that "any vessel, rig, platform, or other vehicle or structure" used in regulated operations on the outer Continental Shelf be "manned or crewed ... by citizens of the United States or aliens lawfully admitted to the United States for permanent residence." 43 U.S.C. § 1356(a) & (a)(3). To this requirement, § 1356(c) makes an exception for any vessel or structure "over 50 percent of which is owned by citizens of a foreign nation or with respect to which the citizens of a foreign nation have the right effectively to control." 43 U.S.C. § 1356(c)(2).[3] According to the conference committee, § 1356 was intended to "reconcile the dual concerns of providing the fullest possible employment for Americans in U.S. Outer Continental Shelf activities and eliminating to the fullest possible extent the likelihood of retaliation by foreign nations against American workers in foreign offshore activities." H.R.REP. NO. 1474, 95th Cong., 2d Sess. 123 (1978); see also id. at 124-26. See also Department of Justice, Office of Legal Counsel, Memorandum Opinion for the General Counsel, Immigration and Naturalization Service, No. 79-68, 3 Op. Off. Legal Counsel 362, 366 (1979), in which Assistant Attorney General John M. Harmon agreed with the Immigration Service that the immigration laws do not apply on the outer Continental Shelf because § 1356 was "intended to be a self-contained statement of the extent to which principles of immigration control are to be applied."
 
 
 14
 When construction workers erect the foundation for an oil platform on the outer Continental Shelf are they manning or crewing a vessel, rig, platform, or other vehicle or structure, and thus within § 1356? If they are covered, the issue raised by this case is far narrower than the unions suppose. Rather than deciding whether the immigration laws generally apply--the issue considered by the Office of Legal Counsel--we would need to determine only whether aliens manning or crewing foreign-owned facilities, and thus within the § 1356(c)(2) exception, were exempted from the immigration laws even if these laws otherwise applied. The district court never reached this issue because it found § 1356 inapplicable: Coast Guard regulations say that manning and crewing refers to the regular complement of a unit (33 C.F.R. § 141.15(a) & (b)); in the court's words, "temporary construction workers are not employees necessary for the routine functioning of an oil production facility"; therefore, "temporary construction workers are not encompassed by the manning and crewing requirement of § 1356(a)(3)." 768 F.Supp. at 381. But if, as the district court said, employees are not part of the regular complement of the oil platform they are constructing, should they nevertheless be considered within § 1356 because they are manning or crewing the crane ship from which they conduct their operations in installing the jacket? Section 1356 covers not only those working on platforms but also those working on "vessels" performing regulated activities on the outer Continental Shelf. This is the point of the Ninth Circuit's decision in Piledrivers', [299 U.S.App.D.C. 72] holding that the aliens working for Heerema on the foreign-owned ship Challenger I were covered by the exception in § 1356(c)(2). 695 F.2d at 393-94. The district court's interpretation may also be at odds with the Coast Guard's reading of its regulations cited by the court. In discussing its final rule implementing § 1356, promulgated several months before the Piledrivers' decision, the Coast Guard mentioned one comment suggesting "that construction workers building a platform be considered part of the regular complement of the construction barge from which they work, if that vessel's primary purpose is construction, fabrication, or alteration of structure attached to the Outer Continental Shelf." The Coast Guard responded: "The language of 141.15"--on which the district court relied--"already permits such a conclusion and no change has been made." 47 Fed.Reg. 9366, 9370 (1982).
 
 
 15
 On this record we cannot determine the applicability of § 1356. The Coast Guard enforces this provision. It may be that the explanation in the Federal Register, although framed in terms of what would be a permissible reading of a regulation, reflects the Coast Guard's interpretation that § 1356(c)'s exemption for foreign-owned vessels and structures applies to construction workers engaged in the building of platforms on the outer Continental Shelf. But we remain uncertain whether, in general, the Coast Guard adheres to this position and, if so, why. The district court, as we have said, did not mention the subject. The record contains little information about how platforms are erected. It does not reveal, for instance, the extent to which workers move back and forth from the ship to the structure while they are installing a jacket.[4] We cannot tell what the situation is after a jacket is in place. It is obvious that additional construction work must be done in order to make the platform operational. Yet there is nothing before us to indicate whether this type of work is customarily performed by nonimmigrant aliens temporarily stationed on American-owned platforms rather than by members of the platforms' regular complement, who would all be citizens or permanent resident aliens as § 1356 requires. With respect to the BALDER, the Coast Guard wrote in April 1989 that because the ship was foreign owned, it was "exempt under 43 U.S.C. 1356 from manning by U.S. citizens...." Congressman Berman thereafter inquired "whether workers who are constructing and installing an offshore platform are technically 'manning or crewing' the platform rather than the construction barge, for the purpose of" § 1356. The Coast Guard replied without directly answering the inquiry. It simply quoted the portion of the Federal Register set out in the preceding paragraph. We therefore cannot even be sure how the Coast Guard viewed the situation with respect to the BALDER and its foreign crew, or why.
 
 
 16
 The short of the matter is that the broad question whether the Immigration and Nationality Act generally applies on the outer Continental Shelf should not be decided while § 1356's applicability remains unresolved. The government argued here and in the district court that the Heerema's alien workers were within § 1356(c)'s exception for crews of foreign-owned vessels[5] and that to require them nevertheless [299 U.S.App.D.C. 73] to qualify for H-2B visas would "render the manning and crewing requirements and their exceptions virtually meaningless." Brief for Appellants at 18. Before granting summary judgment in favor of the unions, the district court should have ruled on the government's contentions or required further development of the pertinent facts despite the agreement of the parties to stay all discovery. We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.
 
 
 17
 So Ordered.
 
 
 
 [1]
 Nonimmigrant aliens must comply with the immigration laws in order to enter the United States. "Entry" is a term of art in the immigration laws. See, e.g., Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); C. GORDON & S. MAILMAN, IMMIGRATION LAW AND PROCEDURE § 11.10, at 11-1 (1992). The Immigration and Nationality Act defines "entry" to mean "any coming of an alien into the United States, from a foreign port or place...." 8 U.S.C. § 1101(a)(13). " 'United States' ... when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C. § 1101(a)(38). The term "continental United States" is defined as follows: "Whenever the phrase 'continental United States' is used in any law of the United States enacted after the date of enactment of this Act [June 25, 1959], it shall mean the 49 States on the North American Continent and the District of Columbia, unless otherwise provided." 1 U.S.C. § 1 note
 
 
 [2]
 The Immigration Service does not believe the immigration laws apply on the outer Continental Shelf. Nevertheless, alien workers on the BALDER apparently held B-1 visas, which are available to nonimmigrant aliens who are "visiting the United States temporarily for business or temporarily for pleasure." 8 U.S.C. § 1101(a)(15)(B). ("Business" does not include construction work. 8 C.F.R. § 214.2(b)(5).) The government explains that these particular workers probably obtained the B-1 visas in order to visit the United States before proceeding to the outer Continental Shelf. Reply Brief for Appellants at 9. "[T]hose alien construction workers who proceed to the OCS without entering the United States," the government adds, "do not require any visa." Id
 
 
 [3]
 Section 1356(c)(1) contains two other exceptions. The requirements of § 1356(a) do not apply if:
 (B) there are not a sufficient number of citizens of the United States, or aliens lawfully admitted to the United States for permanent residence, qualified and available for such work; or
 (C) the President makes a specific finding, with respect to the particular vessel, rig, platform, or other vehicle or structure, that application would not be consistent with the national interest.
 
 
 [4]
 If the alien construction workers man or crew the vessel rather than the jacket, there may be some doubt whether § 1333(a)(1) would have any application to them, wholly apart from the exception in § 1356(c)(2). Unlike § 1356, which applies to "any vessel, rig, platform, or other vehicle or structure," § 1333(a)(1) does not expressly mention "vessels" except by way of exclusion: § 1333(a)(1) extends federal law to "artificial islands, and all installations and other devices permanently or temporarily attached to the seabed" and to "any such installation or other device (other than a ship or vessel) for the purpose of transporting" resources from the seabed and subsoil of the outer Continental Shelf. On the other hand, § 1333(a)(1) might be considered applicable on the basis that these employees are engaging in an "installation," regardless of whether they are accomplishing the task from a vessel not otherwise included within the terms of the provision
 
 
 [5]
 The government also contended that § 1356(c) exempted these workers because, during construction, the jackets were under the control of Heerema. Brief for Appellants at 18-19. Section 1356(c)(2) exempts from § 1356(a)'s employment restrictions, any platform or other structure "with respect to which the citizens of a foreign nation have the right effectively to control...."