73 F.3d 1134
 315 U.S.App.D.C. 352
 UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPE FITTING INDUSTRY, AFL-CIO, and
United Brotherhood of Carpenters and
Joiners of America, AFL-CIO, Appellants,
v.
Janet RENO, United States Attorney General, et al., Appellees.
 No. 94-5256.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1995.
Decided Jan. 16, 1996.
 
 Stephen P. Berzon, San Francisco, CA, argued the cause, for appellants. With him on the briefs were Marsha S. Berzon, San Francisco, CA, Kathy L. Krieger, and Brian A. Powers, Washington, DC.
 Sherri L. Evans, Assistant United States Attorney, Washington, DC, argued the cause, for appellees. With her on the brief were Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence and Barbara J. Valliere, Assistant United States Attorneys. John D. Bates and Sally M. Rider, Assistant United States Attorneys, Washington, DC, entered appearances, for appellees.
 Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge RANDOLPH.
 Dissenting opinion filed by Chief Judge EDWARDS.
 RANDOLPH, Circuit Judge:
 
 
 1
 This case returns to us after proceedings on remand pursuant to our decision in United Association of Journeymen v. Barr, 981 F.2d 1269 (D.C.Cir.1992). As in the first appeal, the principal question is whether aliens, operating from a foreign-owned derrick barge on the outer Continental Shelf, may construct oil platforms for domestic companies without complying with United States immigration laws.
 
 
 2
 * Submerged lands on the outer Continental Shelf lying three miles seaward of, and beyond, each State's coastline generally "appertain" to the United States and hence may be subjected to federal jurisdiction and control. 981 F.2d at 1270. In order to encourage the discovery and development of oil reserves in the region, Congress enacted the Outer Continental Shelf Lands Act of 1953 (the OCSL Act), ch. 345, 67 Stat. 462 (codified as amended, 43 U.S.C. Sec. 1331 et seq.). In its original form, Sec. 1333(a)(1)--one of the provisions with which we are concerned here--"extended" the Constitution and laws of the United States, "to all artificial islands and fixed structures" erected for the development of natural resources. Sec. 4, 67 Stat. 462. In 1978 Congress amended Sec. 1333(a)(1), deleting the phrase "fixed structures" and replacing it with "all installations and other devices permanently or temporarily attached to the seabed." OCSL Act Amendments of 1978, Pub.L. No. 95-372, Sec. 203, 92 Stat. 629, 635.
 
 
 3
 The extent to which Sec. 1331(a)(1), as amended, rendered aliens working on the outer Continental Shelf subject to the Immigration and Nationality Act, 8 U.S.C. Sec. 1101 et seq., might depend, we said in our first opinion, on another provision of the OCSL Act also added in 1978--43 U.S.C. Sec. 1356, Sec. 208, 92 Stat. 669. 981 F.2d at 1273-74. Section 1356 required the Coast Guard to issue rules requiring that "any vessel, rig, platform, or other vehicle or structure" used in regulated operations on the outer Continental Shelf be "manned or crewed ... by citizens of the United States or aliens lawfully admitted to the United States for permanent residence." 43 U.S.C. Sec. 1356(a) & (a)(3). To this nationality requirement, Sec. 1356(c) made three exceptions pertinent to this case. Americans would not have to man or crew any vessel, rig, platform, or structure "over 50 percent of which is owned by citizens of a foreign nation or with respect to which the citizens of a foreign nation have the right effectively to control." 43 U.S.C. Sec. 1356(c)(2). Nor would American crews be necessary if "there are not a sufficient number of citizens of the United States, or aliens lawfully admitted to the United States for permanent residence, qualified and available for such work" (43 U.S.C. Sec. 1356(c)(1)(B)); or if "the President makes a specific finding, with respect to the particular vessel, rig, platform, or other vehicle or structure, that application would not be consistent with the national interest." 43 U.S.C. Sec. 1356(c)(1)(B).
 
 
 4
 The events precipitating this lawsuit occurred in 1989, when Heerema Marine Contractors, S.A., a Dutch-owned Swiss company employing nonimmigrant aliens, performed construction work for Exxon Company, U.S.A., on the outer Continental Shelf off the coast of Santa Barbara, California. Heerema installed platform "jackets"--that is, pre-manufactured steel legs and infrastructure--to serve as the foundations for two Exxon oil platforms. Heerema transported the jackets to the outer Continental Shelf and then secured them to the seabed, working from the BALDER, a semisubmersible derrick barge owned by a Heerema affiliate. The BALDER's crew consisted of aliens. Exxon owned the jackets, but Heerema had custody and control of the jackets during the installation stage.
 
 
 5
 Two labor unions representing American construction workers sued the Attorney General, the Secretary of State, the Secretary of Transportation, the United States Coast Guard, and the Immigration and Naturalization Service. Citing Sec. 1333(a)(1) of the OCSL Act, as amended, the unions claimed that the immigration laws barred alien employees from installing oil platforms on the outer Continental Shelf without first obtaining the appropriate immigration visas.
 
 
 6
 Under the current version of the Immigration and Nationality Act, a nonimmigrant alien may temporarily enter the United States to perform construction work if he possesses an H-2B visa. Before a consular officer may issue an H-2B visa, the employer petitioning for the alien's admission must obtain "certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers." 8 C.F.R. Sec. 214.2(h)(6)(iv)(A)(1); see also 8 U.S.C. Sec. 1101(a)(15)(H)(ii)(b); Kooritzky v. Reich, 17 F.3d 1509 (D.C.Cir.1994).
 
 
 7
 In the first appeal we vacated the district court's judgment in favor of the unions. The court had ruled that the immigration laws applied to the alien workers as a result of Sec. 1331(a), the general provision extending the laws of the United States to the outer Continental Shelf. United Ass'n of Journeymen v. Thornburgh, 768 F.Supp. 375 (D.D.C.1991). We directed the court to determine--in light of evidence regarding the construction of oil platforms and in light of the Coast Guard's interpretation of its regulations--whether the foreign ownership exception in Sec. 1356(c)(2) applied to vessels like the BALDER. 981 F.2d at 1274. In a thorough and well-reasoned opinion, the district court found that workers on derrick barges engaged in installing oil platforms are, under the Coast Guard's regulations, manning and crewing the foreign-owned vessel rather than the domestically-owned platform, and therefore fall within the Sec. 1356(c)(2) exemption. The court further ruled that the immigration laws do "not govern non-immigrant alien construction workers who are covered by the exceptions to the manning and crewing requirements found in Sec. 1356 of the OCSL Act." United Ass'n of Journeymen v. Reno, Civ. Action No. 90-2342, slip op. at 27 (D.D.C. June 24, 1994).
 
 II
 
 8
 One of the principal issues raised in the first appeal and decided on remand is no longer in controversy. The unions do not now dispute what the district court identified as the Coast Guard's "continuous and long-standing" view--namely, that aliens such as those on the derrick barge BALDER were manning and crewing the barge rather than the oil platform, and were thus within the terms of Sec. 1356(c)(2). Slip op. at 21-23.
 
 
 9
 Although the issue is uncontested, it is important to give a correct depiction of the facts relating to it. It is not, for instance, accurate to say that all the work needed to install an offshore oil platform is done on the platform and that "there is no construction work being performed on the barge" (Dissent at 1141). For one thing crane operators and riggers remain on the barge throughout the installation phase. The district court so found. Slip op. at 17. For another thing, considerable work must be done before the oil platform is affixed to the ocean floor. That work is necessarily done from the derrick barge. The two main components of an oil platform are the "jacket" or base and the deck sections of the platform. It is only after the jacket is secured and the deck sections are welded onto the jacket, that workers operate mainly from the platform to complete the installation. Installation can take as little as two weeks and as long as seven months. The work may involve as many as 200 people engaged in welding, rigging, piledriving, steamfitting, pipefitting, painting, plumbing, and electrical work. During this final phase, most of the workers sleep and eat on the barge but perform no work there. Id. When installation is complete, the workers are transported back to land by boat or helicopter[1] and the barge departs with a skeleton crew.
 
 
 10
 This method of operation did not, the district court found, take the workers out of Sec. 1356(c)(2). As used in Sec. 1356(a)(3), "manned or crewed" refers--according to the Coast Guard's regulations (33 C.F.R. Sec. 141.15(a))--to the "regular complement of the unit." There is nothing "absurd" or "ridiculous" about the Coast Guard's view (Dissent at 1141, 1142) and, as we have said, it is unchallenged on appeal. The " 'regular complement of the unit' means those personnel necessary for the routine functioning of the unit." 33 C.F.R. Sec. 141.15(b). As a Coast Guard Commander explained, construction workers on derrick barges "are engaged in the business of the vessel, which is constructing offshore platforms; therefore, construction workers would be the crew members or be part of the complement of the vessel." In statutory terms, foreign-owned derrick barges are thus exempt from Sec. 1356(a)(3)'s requirement that any vessel, rig, platform or structure used in regulated operations on the outer Continental Shelf be "manned or crewed ... by citizens of the United States or aliens lawfully admitted to the United States for permanent residence."
 
 
 11
 This brings us to the critical question: although foreign-owned derrick barges and their workforces operating on the outer Continental Shelf fit within the exception of Sec. 1356(c)(2), and thus do not have to be manned or crewed by American citizens or resident aliens, must the aliens working on them nevertheless comply with the strict requirements of the Immigration and Nationality Act?
 
 
 12
 Insisting that these workers must obtain visas, the unions start from the premise that the OCSL Act's original extension of federal law to the outer Continental Shelf rendered the Immigration and Nationality Act applicable to aliens working from a derrick barge.[2] Our dissenting colleague embraces the same idea. Dissent at 1142-43, 1145. Whether the 1953 version of the OCSL Act accomplished as much is far from certain. We may be certain, however, that before 1978, the immigration laws were never applied to workers on oil platforms on the outer Continental Shelf. This was apparently because the platforms were not considered permanent, a condition some thought necessary under the original Sec. 1331(a)(1), which had extended federal law to "fixed structures." See Memorandum Opinion for the General Counsel, Immigration and Naturalization Service, 3 Op.Off.Legal Counsel 362, 362-63 (1979). Given that view of the statute, it would certainly have followed that derrick barges used to build the platforms were not covered either. And so a quarter of a century after passage of the OCSL Act, the government could report that "no attempt has ever been made to enforce immigration laws on the Outer Continental Shelf." Oversight on the Outer Continental Shelf Lands Act Amendments of 1978: Hearings Before the House Select Comm. on the Outer Continental Shelf, 96th Cong., 1st Sess. 182 (1980) (testimony of Deputy General Counsel Paul Schmidt, Immigration and Naturalization Service), quoted in H.R.REP. NO. 1214, 96th Cong., 2d Sess. 47 (1980).
 
 
 13
 The current Sec. 1331(a)(1) is not as limited as the pre-1978 version. As amended in 1978, the statute now extends federal law to any installation or other device permanently or temporarily attached to the seabed.[3] If we looked only to Sec. 1331(a)(1), the union's case would be a strong one.
 
 
 14
 The question therefore narrows to the effect of another 1978 amendment to the OCSL Act--the addition of Sec. 1356, and particularly the foreign ownership provision in Sec. 1356(c)(2). The unions deem this statute unimportant. They point out that the foreign ownership provision is not framed as an exception to the extension of federal laws (including the immigration laws) to the outer Continental Shelf. By its terms, Sec. 1356(c)(2) simply creates an exemption from Sec. 1356(a)(3)'s requirement that every "vessel, rig, platform, or other vehicle or structure" have a crew consisting of citizens and resident aliens. While a vessel like the BALDER may thereby escape the manning and crewing strictures of Sec. 1356(a)(3), the unions believe its crew members would remain subject to the Immigration and Nationality Act, about which Sec. 1356 is silent.
 
 
 15
 The unions' argument is plausible but not cogent and we think the district court rightly rejected it. Section 1356 may be read as the unions read it, yet it may also be read as the Justice Department and the State Department have read it since its enactment nearly two decades ago. To say that no vessel or structure may have a crew of noncitizens or nonresident aliens unless it is foreign-owned, is to say--or at least, to suggest rather strongly--that foreign-owned vessels and structures may have such crews. Sixteen years ago, when the ink was scarcely dry on the OCSL Act amendments, the Justice Department carefully studied this issue at the request of the Immigration and Naturalization Service. The Justice Department concluded that Sec. 1356 is "a self-contained statement of the extent to which principles of immigration control are to be applied": if the crew of a foreign-owned vessel or structure need not consist of citizens or resident aliens, the Immigration and Nationality Act imposes no further restrictions. 3 Op.Off.Legal Counsel at 366. This contemporaneous interpretation by the agency of government responsible for administering the immigration laws deserves considerable respect, not only because of the Justice Department's responsibilities and expertise, but also because the reasons supporting its conclusion are compelling. See, e.g., NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., --- U.S. ----, ----, 115 S.Ct. 810, 813 (1995); National Ass'n of Regulatory Util. Comm'rs v. SEC, 63 F.3d 1123, 1126 (D.C.Cir.1995).[4]
 
 
 16
 Foremost among those reasons is that applying the Immigration and Nationality Act despite Sec. 1356 would be treating that provision, and the exceptions written in it, as nonsensical. Consider Sec. 1356(c)(1)(A). This states that if a contract in effect before September 1978 (the date of the amendments) required manning by aliens, the vessel or structure could continue to be so manned. The evident purpose was to "avoid any disruptions in O[uter] C[ontinental] S[helf] activities." H.R.REP. NO. 590, 95th Cong., 1st Sess. 176 (1977), 1978 U.S.C.C.A.N. 1450, 1582; H.R.CONF.REP. No. 1474, 95th Cong., 2d Sess. 124, reprinted in 1978 U.S.C.C.A.N. 1674, 1723. Yet if one accepted the unions' position and the position of our dissenting colleague, disruptions would have been inevitable: despite Sec. 1356(c)(1)(A), the general immigration law would have forced the owners of each vessel and structure covered by such contracts to replace their crews with American citizens and resident aliens (assuming qualified domestic workers were available). The exemption granted in Sec. 1356(c)(1)(A) would then, through the interpretation of the unions and of the dissent, be rendered essentially worthless.
 
 
 17
 The last clause of Sec. 1356(c)(2) would also be drained of meaning if we adopted the unions' and the dissent's view. Whenever a foreign government imposes its own national manning requirements for the development of its offshore oil and gas, Sec. 1356(c)(2) permits the President to respond by revoking the exemption for vessels and structures owned by citizens of that foreign nation. But if the unions and the dissent were right, the President's removal of the exemption would amount to an empty gesture: for all practical purposes, the Immigration and Nationality Act already would have forced the foreign owners to employ American crews on their vessels and structures. Much the same may be said of Sec. 1356(c)(1)(C), which allows the President to exempt even American-owned vessels and structures from the manning and crewing requirement if this would be in the national interest. Through these provisions and through Sec. 1356 in general, Congress sought to "reconcile the dual concerns of providing the fullest employment for Americans in U.S. O[uter] C[ontinental] S[helf] activities and eliminating to the fullest possible extent the likelihood of retaliation by foreign nations against American workers in foreign offshore activities." H.R.CONF.REP. No. 1474, supra, at 123, 1978 U.S.C.C.A.N. at 1722. The district court put the point succinctly: "If alien workers on the O[uter] C[ontinental] S[helf] were subject to both Sec. 1356 and the [Immigration and Nationality Act], the scales would invariably tip in favor of the first concern, thereby disrupting the balance of interests Congress hoped to create." Slip op. at 27.
 
 
 18
 This conclusion gains further support from Sec. 1356(c)(1)(B), a provision exempting units from the manning and crewing requirements when there are insufficient citizens and permanent residents qualified and available to perform the necessary work. The conference report observed, correctly, that this exception incorporates "virtually the present standard of the immigration law." H.R.CONF.REP. NO. 1474, supra, at 124, 1978 U.S.C.C.A.N. at 1723. "Implicit in that statement, however, appear[s] to be the assumption that an exception, independent of the immigration laws, is being created." 3 Op.Off.Legal Counsel at 367.
 
 
 19
 It is true that the union's interpretation would not deprive Sec. 1356 of all meaning: Sec. 1356 would still operate with respect to free floating vessels, which are not covered by Sec. 1333(a)(1) (it extends federal law to the seabed and artificial islands and installations permanently or temporarily attached to the seabed). But that is not exactly a point in the unions' favor. To say that Sec. 1356 would have some residual effect in one limited area, is to admit that the statute is being stripped of any effect everywhere else. Section 1356 applies to "any ... rig, platform, or other ... structure," not just to "vessels." If, as the unions suppose, the immigration laws govern the use of nonimmigrant workers on the outer Continental Shelf despite Sec. 1356, then Congress acted nonsensically in subjecting such installations and anchored vessels to the regulatory system, and the exceptions, set forth in Sec. 1356. It is, in short, not enough that the union's position allows one portion of Sec. 1356(c)(2) to survive, the portion, that is, dealing with free-floating vessels. The statute should be read so that all of it has effect--so that, in other words, the exemption for foreign-owned derrick barges is meaningful. See, e.g., Gustafson v. Alloyd Co., --- U.S. ----, ----, 115 S.Ct. 1061, 1069 (1995); Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655, 665 (D.C.Cir.) (in banc), amended, 38 F.3d 1224 (D.C.Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995); Abourezk v. Reagan, 785 F.2d 1043, 1054 (D.C.Cir.1986), aff'd by an equally divided court, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).
 
 
 20
 It is not accurate to describe, as the unions do, the district court's reading of the OCSL Act as a partial repeal of Sec. 1333(a)(1). See Morton v. Mancari, 417 U.S. 535, 549, 94 S.Ct. 2474, 2481-82, 41 L.Ed.2d 290 (1974). Section 1356 and the amendment to Sec. 1333(a)(1) were enacted simultaneously. The district court thus had to reconcile two seemingly inconsistent provisions in the same legislation; the court was not determining whether one provision "repealed" the other. Furthermore, Sec. 1333(a)(1) is written in general terms. It does not expressly refer to nonimmigrant workers or to the immigration laws. In contrast, Sec. 1356 lays out a detailed system governing who may work on vessels and structures conducting regulated activities on the outer Continental Shelf, a system drawing distinctions between citizens and resident aliens and other workers and vesting discretion in the President to restrict or relax Sec. 1356's rules on the composition of the workforce. The canon of statutory construction dictating that specific statutory provisions govern general ones would therefore lead us to favor Sec. 1356 over Sec. 1333(a)(1). See, e.g., Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992); Techniarts Eng'g v. United States, 51 F.3d 301, 304 (D.C.Cir.1995). The Supreme Court has instructed that if "there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) (internal quotations omitted). No such clear intention emerges here.
 
 
 21
 Because we agree with the district court that the Immigration and Nationality Act does not apply to those who are manning or crewing foreign-owned derrick barges qualifying for the exemption set forth in Sec. 1356(c)(2),[5] the judgment is affirmed.
 
 HARRY T. EDWARDS, Chief Judge, dissenting:
 
 22
 The Outer Continental Shelf Lands Act ("OCSLA"), first enacted in 1953, explicitly applies federal law to all structures permanently or temporarily attached to the seabed of the Outer Continental Shelf ("OCS"). 43 U.S.C. Sec. 1333(a)(1) (1988). Thus, for purposes of federal immigration law, stepping onto an oil platform on the OCS should be no different from stepping ashore at any harbor on the mainland: having set foot in United States territory, all aliens become subject to United States immigration restrictions.
 
 
 23
 In defiance of the plain terms of the statute, the majority holds that foreign workers who are on the OCS to construct a domestically-owned oil platform are nonetheless exempt from United States immigration restrictions if, under a Coast Guard regulation, they are found to "man or crew" a foreign-owned vessel that provides them temporary quarters while they complete the construction project. However, neither the statute nor good reason explains why workers constructing a domestically-owned oil platform on the OCS should be exempt from our nation's immigration laws simply because they happen to sleep on a foreign-owned barge anchored nearby. Indeed, such a result turns section 1356 of OCSLA, which requires that all OCS units be manned and crewed by United States citizens or permanent resident aliens, on its head. Instead of offering additional protection for American workers on the OCS, the provision has now been transformed into an enormous loophole by which United States corporations can employ foreign workers despite the ready availability of domestic labor. Because I find that today's decision perverts both the explicit language of section 1356 and the congressional intent behind the manning and crewing requirements, I dissent.
 
 
 24
 * * * * * *
 
 
 25
 As an initial matter, it is worth noting that the Coast Guard's definition of the manning and crewing requirements is both absurd and contrary to the statute. According to the Coast Guard, even though the workers in question perform all of their construction work on the oil platform itself, they are nevertheless deemed to man and crew the derrick barge on which they eat and sleep. See United Ass'n of Journeymen v. Reno, Civ.Action No. 90-2342, slip op. at 5 (D.D.C. June 24, 1994), reprinted in Joint Appendix 16. Yet, it is undisputed that there is no construction work being performed on the barge. Under the Coast Guard's interpretation, then, had the workers paddled out to the platform in an inflatable raft that also carried their food and a sleeping bag, they would be manning and crewing the raft (rather than the oil platform) for purposes of section 1356. This interpretation of the statute is nonsensical and therefore not entitled to this court's deference. The manning and crewing requirements were obviously designed to apply to the place where the workers work, not where they eat and sleep. Thus, there is no reason that the section 1356(c)(2) exemption regarding crew members on foreign-owned units should be relevant to the workers in this case because it is undisputed that the platform (as opposed to the barge) is not foreign-owned.
 
 
 26
 Moreover, even if one were to accept the Coast Guard's view that the workers should be considered part of the regular complement of the derrick barge, such a determination tells nothing more than who is "manning and crewing" a particular unit for purposes of section 1356. It does not address who is working in the United States pursuant to the Immigration and Nationality Act ("INA"), as applicable to the OCS under section 1333. There is no dispute that the oil platform is subject to the INA. Thus, even if these foreign workers are exempt from the INA while they float around on the barge, they essentially enter the United States every single day to come to work on the oil platform. The construction workers should therefore be treated no differently from any other crew member of a foreign ship who disembarks at a United States harbor and enters the country. It would be ridiculous to say that, merely because such foreign workers man and crew a foreign-owned vessel, they are somehow exempt from this country's immigration laws while they are within United States borders.
 
 
 27
 Yet, the majority asserts not only that the workers should be deemed to man and crew the derrick barge even while working on the oil platform, but also that the exemption from manning and crewing requirements found in section 1356(c)(2) overrides all the regulations of the INA. This argument makes no sense.
 
 
 28
 * * * * * *
 
 
 29
 It is undisputed that section 1333 of OCSLA explicitly applies all United States law, including the INA, to the OCS. Under the INA, nonimmigrant aliens, who generally consist of those seeking entry into the United States on a temporary basis, may qualify for visas only if they meet certain statutory criteria. See 8 U.S.C. Sec. 1101(a)(15) (1994).
 
 
 30
 Nothing about section 1356 of the OCSLA amendments of 1978 evinces an intent to alter the INA's general application to the OCS, and neither the INA nor section 1333 is even mentioned in section 1356. Rather, section 1356(a) adds new manning and crewing requirements that restrict employment on the OCS to either United States citizens or permanent resident aliens. 43 U.S.C. Sec. 1356(a) (1988). The effect of this provision is to prevent those nonimmigrant aliens who could receive visas under the INA from manning or crewing a vessel, rig, or fixed structure on the OCS. Thus, section 1356(a) is best read not as a replacement to the INA, but as a further restriction on employment of foreign workers on the OCS. Indeed, even with the provisions of the INA in effect, the Committee that originally drafted the manning and crewing requirements reported that it "was concerned ... that foreign workers on the U.S. Outer Continental Shelf have been increasing in recent years." H.R.REP. NO. 590, 95th Cong., 1st Sess. 175 (1977).
 
 
 31
 Because section 1356(a), on its own, sweeps broadly and requires anyone operating on the OCS to hire only United States citizens or permanent resident aliens, it is not surprising that Congress carved out some exceptions, including the one for foreign ownership. 43 U.S.C. Sec. 1356(c)(2). However, the plain language of section 1356(c) indicates that its exceptions were intended only as exemptions to the strict manning and crewing regulations issued under subsection (a), and not to the general application of the INA. Indeed, Congress could hardly have been more clear in its intent. Section 1356(c) is entitled, "Exceptions from manning requirements," and explicitly provides that, if any of the enumerated exceptions are applicable, "[t]he regulations under subsection (a)(3) of this section shall not apply." 43 U.S.C. Sec. 1356(c) (emphasis added). As the Supreme Court has stated, where, as here, the statutory language is plain, " 'the sole function of the courts is to enforce it according to its terms.' " United States v. Ron Pair Enters., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Instead, the majority, without any textual justification whatsoever, finds in section 1356(c) an implicit exemption, not only to the manning requirements, but to the INA as well.
 
 
 32
 The only way the majority can justify this strained reading of the clear language of the statute is to find that section 1356 and the INA are "mutually repugnant" and cannot logically coexist. However, although these provisions overlap in some respects, there are also significant areas in which they do not. Moreover, there is nothing to indicate that Congress intended that section 1356 would replace the INA with regard to employment on the OCS. Indeed, the legislative history of the 1978 amendments suggests that section 1356 was actually designed to close certain regulatory gaps that existed despite application of the INA to the OCS.
 
 
 33
 In certain situations, section 1356 applies when the INA does not. One such example is the regulation of free-floating vessels. Prior to the 1978 amendments, if a domestically-owned barge were performing work on the OCS, it could hire an all-foreign crew because the INA applies only to structures attached to the seabed, and not to vessels. Section 1356 remedies this absence of regulation by requiring that such a barge be manned and crewed by United States citizens or permanent resident aliens. If the barge were sold to a foreign-owned company, the exemption found in section 1356(c)(2) would then apply, and the barge would again face no labor restrictions.
 
 
 34
 Thus, section 1356 functions as an important supplement to the INA, rather than a replacement. Indeed, the legislative history indicates that section 1356 was, from the very beginning, an attempt to remedy the fact that free-floating vessels were not subject to any of the provisions of the INA that are designed to protect domestic jobs. At congressional hearings regarding the OCSLA amendments, the Seafarers International Union first proposed the manning and crewing requirements in order to fill the "major regulatory gap" that existed because the INA did not apply to free-floating vessels. Outer Continental Shelf Lands Act Amendments of 1977: Hearings on H.R. 1614 Before the House Ad Hoc Select Committee On the Outer Continental Shelf, 95th Cong., 1st Sess. 1258 (1977). In its statement, the union noted that
 
 
 35
 [c]urrent U.S. law does not prevent foreign-flag and foreign crewed drilling rigs from operating on the U.S. Outer Continental Shelf. As a result, increasing numbers of aliens are being employed for extended periods in our OCS areas. In view of the large available pool of skilled U.S. construction and drilling trades and related service workers, we feel that the use of any foreign crews on these rigs is totally unnecessary.
 
 
 36
 Id. at 1302. According to the union, because the laws that were then applicable to the OCS did not prevent such foreign crews, further congressional action was necessary. See generally id. at 1258-1307.
 
 
 37
 The majority points out that section 1356 refers to fixed structures as well as free-floating vessels on the OCS. Because there is no question that the INA also applies to fixed structures, the question becomes whether both provisions can logically apply to one area. For example, a domestically-owned platform must be manned and crewed by United States citizens or permanent resident aliens pursuant to section 1356, but the platform (because it is attached to the seabed) is also subject to the INA's provision that nonimmigrant alien workers applying for so-called "H-2B" visas cannot enter the country if American workers are available. See 8 U.S.C. Sec. 1101(a)(15)(H)(ii)(b). In such a situation, the two provisions are duplicative. The majority stops there, assuming, solely because there is some overlap, that section 1356 must therefore be read to replace the INA altogether.
 
 
 38
 However, H-2B visas are not the only visas available to nonimmigrant aliens seeking to work on the OCS. The INA offers many other visa categories, and none of the other ways in which one can enter the country are subject to the labor-protecting provisions applicable to H-2B visas.[1] See 8 U.S.C. Sec. 1101(a)(15). Thus, prior to the 1978 amendments, a foreign citizen who could qualify for entrance into the United States under any visa provision other than H-2B would have been free to work on a domestically-owned oil platform in the OCS regardless of the availability of United States labor. After the passage of section 1356, the owners of such an oil platform would be forced to hire only domestic labor despite the fact that they were not forced to do so under the INA. And again, if the platform were sold to a foreign-owned corporation, the 1356(c)(2) exemption would then apply, and the new owners would again be free to employ any non-H-2B aliens they wished. Thus, even on fixed structures, the two provisions can both be meaningfully enforced according to their terms.[2]
 
 
 39
 It is also implausible for the majority to assert that the manning and crewing requirements and their exceptions supplant the INA, because the INA is a broad statute that regulates all types of alien entry into the United States, whereas section 1356 only addresses the question of employment while in the country. Following the logic of the majority's view, workers falling under section 1356(c)(2)'s exception are subject to no immigration restrictions at all. For example, the INA provides that aliens who have communicable diseases, who have been convicted of a crime, or who have engaged in terrorist activity are ineligible to receive visas. See 8 U.S.C. Sec. 1182(a). Surely it cannot be that Congress meant to foreclose the Immigration and Naturalization Service from regulating the presence of known terrorists who are working in United States territory merely because those terrorists have been deemed to "man and crew" a foreign vessel.[3]
 
 
 40
 Finally, it is significant, I think, that the very same committee that drafted the 1978 amendments subsequently rejected the reading of section 1356 that the majority adopts today. While post-enactment pronouncements are ordinarily not dispositive regarding congressional intent, see, e.g., Cipollone v. Liggett Group, Inc., 505 U.S. 504, 520, 112 S.Ct. 2608, 2619, 120 L.Ed.2d 407 (1992), in this case, the Select Committee on the Outer Continental Shelf was specifically charged with overseeing and evaluating the Government's implementation of the new statutory provisions. H.R.REP. NO. 1214, 96th Cong., 2d Sess. iii (1980). In its final oversight report, issued in 1980, the Committee, in no uncertain terms, flatly rejected the Government's position regarding section 1356, calling it "a blatant example of misinterpretation of the OCS Act on the part of an executive branch agency." Id. at 98. Further, the Report notes that "[Committee] Chairman John M. Murphy, who was intimately involved in negotiating the Section [1356] language in the OCS conference Committee disagrees with [the Government's position], and views Section [1356] as a supplement to rather than a replacement of the provisions [of the INA]." Id. at 68. The report also quotes Chairman Murphy directly:
 
 
 41
 As Chairman of both the House-Senate Conference and the House Select Committee on the OCS, I am quite familiar with the language ... and I can emphatically state Congressional intent in this instance.... Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development and production.
 
 
 42
 Id. (internal quotation omitted).
 
 
 43
 Although this report, in and of itself, would not be enough to overturn clear statutory language to the contrary, it further supports the view that, in this case, the most obvious reading of the statute is, in fact, the reading Congress intended. Cf. Cannon v. University of Chicago, 441 U.S. 677, 687 n. 7, 99 S.Ct. 1946, 1952 n. 7, 60 L.Ed.2d 560 (1979) ("Although we cannot accord [post-enactment] remarks the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of [the statute]...."). Given that section 1356 and the INA can both be enforced according to their terms without any mutual repugnancy, there is absolutely no justification for the majority to overturn the plain language of the statute and the clearly expressed legislative intent of Congress.[4]
 
 
 44
 * * * * * *
 
 
 45
 The bottom line is that, by first enacting section 1333(a)(1) in 1953, Congress made a clear policy choice to extend all federal law, including the INA, to the OCS. There is absolutely no indication that, in enacting section 1356 some 25 years later, Congress silently reversed that choice. As a result of the majority's erroneous interpretation, United States workers will lose job opportunities on the OCS, the very harm Congress sought to prevent by enacting section 1356. Domestic corporations wishing to construct oil platforms can now entirely avoid the labor-protecting provisions of the INA simply by using foreign-owned derrick barges to shelter the workers while they sleep. Because such a result makes a mockery of both the plain language of the statute and the congressional intent behind it, I dissent.
 
 
 
 [1]
 This is doubtless why, despite the view of the Immigration and Naturalization Service that the immigration laws do not apply on the outer Continental Shelf, alien workers on the BALDER held B-1 visas. This type of visa is available to a nonimmigrant alien who is "visiting the United States temporarily for business or temporarily for pleasure." 8 U.S.C. Sec. 1101(a)(15)(B). ("Business" does not include construction work. 8 C.F.R. Sec. 214.2(b)(5).) See United Ass'n of Journeymen v. Barr, 981 F.2d at 1272 n. 2
 
 
 [2]
 Our first opinion explained why, in the absence of such an extension, the immigration laws would not apply to the outer Continental Shelf: nonimmigrant aliens arriving there would not be entering the United States. 981 F.2d at 1271 n. 1. "Entry" is a term of art in the immigration laws. See, e.g., Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); 1 CHARLES GORDON, ET AL., IMMIGRATION LAW AND PROCEDURE Sec. 11.01, at 11-1 (1995). The Immigration and Nationality Act defines "entry" to mean "any coming of an alien into the United States, from a foreign port or place...." 8 U.S.C. Sec. 1101(a)(13). " 'United States' ... when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." 8 U.S.C. Sec. 1101(a)(38). The term "continental United States" is defined as follows: "Whenever the phrase 'continental United States' is used in any law of the United States enacted after the date of enactment of this Act [June 25, 1959], it shall mean the 49 States on the North American Continent and the District of Columbia, unless otherwise provided." 1 U.S.C. Sec. 1 note
 
 
 [3]
 43 U.S.C. Sec. 1331(a) now provides:
 The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a state: Provided, however, That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.
 
 
 [4]
 The dissent finds "significant" several post-enactment statements in a House committee report attesting to the personal opinions of the committee's chairman about what he believed the 1978 amendments had accomplished. Dissent at 1144-45. It is bad enough to interpret a statute on the basis of what a later Congress says about it. See United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331-32, 4 L.Ed.2d 334 (1960). It is far worse to rely on the views--not of a later Congress--but of a few members of a later Congress. During this committee's oversight hearing, a Justice Department representative, confronted with statements similar to those contained in the dissent, gave the proper response. The statements merely serve, he said, as "an example of why you really cannot use the personal and anecdotal experience of someone in the legislative process as part of statutory interpretation." Oversight on the Outer Continental Shelf Lands Act Amendments of 1978, supra, at 177 (testimony of Jack M. Goldklang)
 
 
 [5]
 Citing Montana v. United States, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979), and United Ass'n of Journeymen, Local 342 v. Valley Eng'rs, 975 F.2d 611, 615 (9th Cir.1992), the government claims that Piledrivers' Local Union No. 2375 v. Smith, 695 F.2d 390, 393 (9th Cir.1982)--which decided the same legal issues as those raised here--collaterally estops the unions even though the unions were not named as parties. Because our decision on the merits is the same as that in Piledrivers', we do not express any view on the preclusive effect of the Ninth Circuit's ruling
 
 
 [1]
 Indeed, these non-H-2B visa categories could well include significant numbers of technical, executive, and managerial employees who are part of the regular complement of units operating on the OCS. For example, the INA permits entry into the United States of nonimmigrants engaged in certain "specialty occupations" requiring at least a bachelor's degree, 8 U.S.C. Sec. 1101(a)(15)(H)(i)(b), as well as nonimmigrants who have been employed outside the United States and then seek to enter the country temporarily in order to continue to render services to the same employer "in a capacity that is managerial, executive, or involves specialized knowledge," 8 U.S.C. Sec. 1101(a)(15)(L)
 
 
 [2]
 The majority argues that applying the INA along with section 1356 to the OCS is nonsensical because section 1356(c)(1)(A) permits aliens employed under contracts entered into prior to the effective date of the statute to remain on the OCS. According to the majority, such a provision would be useless if the provisions of the INA could be applied to exclude those same aliens. But this argument ignores all those aliens who might be employed on the OCS under visas other than H-2B visas. For those aliens, the "grandfathering" provision would have the important consequence of allowing them to remain on the OCS even though section 1356 would, for the first time, forbid their presence
 
 
 [3]
 The majority also points to a clause in section 1356(c)(2) that permits the President to revoke the exemption for foreign-owned units whenever a foreign government imposes its own national manning requirements to its offshore oil and gas operations. According to the majority, such an action would be an "empty gesture" if the INA already forced foreign owners to employ American crews. However, as described supra, the INA would not apply to workers on free-floating vessels, nor would it restrict workers who had entered the United States under visas other than H-2B visas. Therefore, there is no reason to assume that presidential action under section 1356(c)(2) would be devoid of practical effect
 
 
 [4]
 The Government also claims in its brief that the two appellant unions are precluded from litigating the statutory construction issue in this case because of a previous Ninth Circuit decision rendered against a local affiliate union. See Piledrivers' Local Union No. 2375 v. Smith, 695 F.2d 390 (9th Cir.1982). Because issue preclusion cannot be applied against a litigant who was not a party to the prior adjudication, see 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & FRANK W. ELLIOTT, FEDERAL PRACTICE AND PROCEDURE Sec. 4449 (1981), the Government argues that the United Brotherhood of Carpenters and Joiners, as the parent of the piledrivers' local, effectively controlled the first litigation and is therefore precluded from relitigating the issue under the Supreme Court's decision in Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). See id. at 154-55, 99 S.Ct. at 974 (The Court ruled that if a party were "the laboring oar" in a previous litigation, even if not a named party, preclusion is appropriate.). Although I am unconvinced that the mere parent/affiliate relationship, by itself, is sufficient to show that the parent union controlled the litigation and should be precluded, that question is irrelevant because it is undisputed that the other union appellant in this case, the Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, has no affiliation with the local union plaintiff in Piledrivers'. Thus, even under the Government's theory, this union would not be precluded from bringing the present claim